IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Crim. Action. No. 15-23-RGA |
| | ) |
| DAVID R. GIBSON, | ) |
| ROBERT V.A. HARRA, | ) |
| WILLIAM B. NORTH, and | ) |
| KEVYN N. RAKOWSKI, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Robert F. Kravetz, Esq., Lesley F. Wolf, Esq., Jamie M. McCall, Esq., Assistant United States Attorneys, for the Government.

John S. Malik, Esq., LAW OFFICE OF JOHN S. MALIK, Wilmington, DE; Kenneth M. Breen, Esq., John P. Nowak, Esq., Phara A. Guberman, Esq., PAUL HASTINGS LLP, New York, NY, for Defendant David R. Gibson.

Michael P. Kelly, Esq., Steven P. Wood, Esq., Geoffrey N. Rosamond, Esq., MCCARTER & ENGLISH, Wilmington, DE; Andrew M. Lawler, Esq., ANDREW M. LAWLER, P.C., New York, NY, for Defendant Robert V.A. Harra.

David Wilks, Esq., R. Stokes Nolte, Esq., Andrea S. Brooks, Esq., WILKS, LUKOFF & BRACEGIRDLE LLC, Wilmington, DE; Thomas A. Foley, Esq., THOMAS A. FOLEY, Wilmington, DE, for Defendant William B. North.

Bartholomew J. Dalton, Esq., Ipek K. Medford, Esq., Andrew C. Dalton, Esq., DALTON & ASSOCIATES P.A., Wilmington, DE; Henry Klingeman, Esq., Helen Nau, Esq., KROVATIN KLINGEMAN LLC, Newark, NJ, for Defendant Kevyn N. Rakowski.

August **30**, 2018



**ANDREWS, U.S. DISTRICT JUDGE:**

On May 3, 2018, Defendants David Gibson, Robert Harra, William North, and Kevyn

Rakowski were convicted on one count of conspiracy, one count of securities fraud, nine counts

of making false statements to federal regulators, and four counts of making false entries in

federal banking records. Gibson was also convicted on three counts of making false

certifications in financial reports. At the close of the Government's case and again after trial,

Defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

Defendants also moved in the alternative for a new trial pursuant to Federal Rule of Criminal

Procedure 33. For the reasons that follow, those motions (D.I. 743, 744, 745, 746, 816)[1] are

denied.

## I. BACKGROUND[2]

On August 2, 2016, a federal grand jury returned a Third Superseding Indictment

charging Defendants and the Wilmington Trust Corporation[3] with various crimes related to the

Bank's reporting of its loans that were past due 90 days or more. (*See* D.I. 243). The crux of the

Government's allegations was that from approximately October 2009 to November 2010,

Defendants, all senior employees of Wilmington Trust, caused the Bank to conceal from federal

regulators and the public, millions of dollars in "past due" commercial real estate loans, via the

so-called "Waiver Practice." According to the indictment, the Waiver Practice involved

"waiving," that is, omitting from the Bank's public reports filed with the Securities and

---

[1] Briefing on the motions is complete. (*See* D.I. 750, 824, 825, 826, 827, 828, 829, 832, 833, 834, 835, 836). Defendants each submitted separate briefs and have joined in each other's arguments.

[2] I provide here only a brief background of the allegations in the indictment and the procedural history of this case. The nearly seven-week-long trial resulted in thousands of pages of transcript and hundreds of exhibits. I refer to relevant testimony and evidence presented at trial in analyzing Defendants' motions.

[3] I refer to the former corporate defendant as either "Wilmington Trust" or "the Bank."

Exchange Commission ("SEC") and the Federal Reserve Bank, matured loans that were designated as "current for interest" and in the "process of extension." That practice, the indictment alleged, caused the Bank to file public reports that materially misrepresented its amount of loans that were past due 90 days or more.

In connection with those alleged misrepresentations, the nineteen-count indictment charged Defendants and the Bank with conspiracy in violation of 18 U.S.C. § 371 (Count 1), securities fraud in violation of 18 U.S.C. § 1348 (Count 2), making false statements in documents filed with the SEC in violation of 15 U.S.C. §§ 78m(a) & 78ff (Counts 3, 4, and 6), making false statements to the SEC and the Federal Reserve in violation of 18 U.S.C. § 1001 (Counts 5 and 11–16), and making false entries in banking records in violation of 18 U.S.C. § 1005 (Counts 7–10). The indictment also charged Gibson with making false certifications in financial reports in violation of 18 U.S.C. § 1350 (Counts 17–19).

Trial was originally scheduled to begin on October 10, 2017. That morning, the Government and Wilmington Trust announced they had entered a settlement agreement. (*See* D.I. 592). I thereafter continued the individual defendants' trial to March 2018 (D.I. 582) and entered an order dismissing Wilmington Trust from the case (D.I. 583).

Following jury selection, trial began on March 12, 2018. The Government called twenty-two witnesses. On April 11, 2018, the Government rested its case-in-chief. Defendants filed motions for judgment of acquittal pursuant to Rule 29. I held oral argument on April 16, 2018. I stated in open court the following day that I would reserve decision on those motions. (Trial Transcript ("Tr.") at 6348:8–18).[4] I explained that while I was "fairly convinced that the

---

[4] The trial transcript is located at D.I. 780, 781, 782, 783, 784, 785, 786, 787, 788, 789, 790, 791, 792, 793, 794, 795, 796, 797, 798, 799, 800, 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, and 811. The trial transcript is consecutively paginated, and I refer to the consecutive pagination rather than the individual docket items.

Government ha[d] put forth enough evidence on all relevant issues other than essentially the mental state of the defendants," I would defer ruling on the motions given the complexity of the mental state issue. (*See id.*). Defendants presented their case-in-chief that same day. The parties completed closing arguments by April 25, 2018. On May 3, 2018, the jury returned guilty verdicts against Defendants on each count of the indictment.[5] Defendants subsequently filed a joint motion for judgment of acquittal pursuant to Rule 29, or, in the alternative, for a new trial pursuant to Rule 33. (D.I. 816).

## II.   MOTIONS FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure directs the Court to enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In ruling on a Rule 29 motion, the Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). The Court is required to "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). "Thus, a finding of insufficiency should be confined to cases where the prosecution's failure is clear." *Smith*, 294 F.3d at 477 (citation omitted). Indeed, the defendant faces a "very heavy burden" in demonstrating that the evidence is insufficient to support the conviction. *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008).

---

[5] The jury did not consider Count 3 because Wilmington Trust was the only defendant charged in that count.

3

The Third Circuit has cautioned that in reviewing the sufficiency of the evidence, the Court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted). The verdict will stand if there is substantial evidence, direct or circumstantial, to support the conviction. *See United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008); *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003). Indeed, "the Government may defeat a sufficiency-of-the-evidence challenge on circumstantial evidence alone." *Iglesias*, 535 F.3d at 156.

The Court "doe[s] not view the government's evidence in isolation, but rather, in conjunction as a whole." *Brodie*, 403 F.3d at 134. In other words, it "must determine whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

## B. Discussion

Defendants advance various arguments in support of their motions for judgment of acquittal. They principally challenge the sufficiency of the evidence supporting their convictions. Defendants also challenge their convictions on Due Process grounds.[6]

### 1. False Statement and False Banking Entry Counts

Defendants challenge the jury's verdict as to the false statement and false banking entry counts charged in the indictment. They are Counts 4 to 16. Counts 4 and 6 charged Defendants with making false statements in documents required to be filed with the SEC. Counts 7 to 10

---

[6] Defendants additionally move for judgment of acquittal on the basis that the Government's conduct in this case caused a prejudicial variance and a constructive amendment. They argue, in the alternative, that I should grant them a new trial on that basis. I address Defendants' variance and constructive amendment arguments as part of my analysis of their Rule 33 motions.

4

charged Defendants with making false entries in federal banking records. Counts 5 and 11 to 16 charged Defendants with making false statements to the SEC and the Federal Reserve. Defendants argue that the Government failed to prove the falsity and *mens rea* elements of those counts. Defendant North additionally argues that the Government failed to prove that he aided and abetted others in committing those counts.

> a. Falsity

Defendants argue that no rational juror could have found the statements at issue false. More specifically, they contend that the reporting requirements for documents filed with the SEC and the Federal Reserve do not unambiguously define the term "past due." (*See* D.I. 824 at 10; D.I. 825 at 25; D.I. 826 at 7; D.I. 828 at 19). Absent such a definition, they argue, the Government was required and failed to prove beyond a reasonable doubt that the "past due" loan amounts reported by the Bank were not based upon a reasonable interpretation of those reporting requirements. (D.I. 828 at 20).

> i. *"Past Due" Loan Reporting Requirements*

Before addressing Defendants' ambiguity arguments, I provide here a brief overview of the reporting regulations relevant to this case.

As noted above, the Third Superseding Indictment charged Defendants with materially misrepresenting Wilmington Trust's amount of loans that were past due 90 days or more in documents filed with the SEC and the Federal Reserve. Those documents included Call Reports and monthly regulatory reports filed with the Federal Reserve as well as Forms 10-K and 10-Q filed with the SEC.

As to Call Reports, the instructions for "past due" loan reporting are found in "Schedule RC-N – Past Due and Nonaccrual Loans, Leases, and Other Assets." (*See* GX 86A). Schedule

RC-N requires banks to disclose their loans that are 90 days or more past due. (*Id.*; Tr. at

2975:14–2979:22). The instructions state in relevant part:

### Definitions

Past Due – The past due status of a loan or other asset should be determined in
accordance with its contractual repayment terms. For purposes of this schedule,
grace periods allowed by the bank after a loan or other asset technically has
become past due but before the imposition of late charges are not to be taken into
account in determining past due status. Furthermore, loans, leases, debt
securities, and other assets are to be reported as past due when either interest or
principal is unpaid in the following circumstances: . . .

(3) Single payment and demand notes, debt securities, and other assets providing
for the payment of interest at stated intervals are to be reported as past due after
one interest payment is due and unpaid for 30 days or more.

(4) Single payment notes, debt securities, and other assets providing for the
payment of interest at maturity are to be reported as past due after maturity if
interest or principal remains unpaid for 30 days or more.

(GX 86A, pp. 1–2).[7]

Forms 10-K and 10-Q, on the other hand, are divided into two primary sections. The first

is Management's Discussion and Analysis ("MD&A"). (Tr. at 1321:2–7). The second is the

Financial Statements section. (*Id.*).

The MD&A section is governed by Regulation S-K, which directs bank holding

companies to Industry Guide 3. (*See id.* at 1322:1–10, 1325:18–19). Industry Guide 3 in turn

instructs bank holding companies to state their "[a]ccruing loans which are contractually past due

90 days or more as to principal or interest payments." (GX 12, p. 7; Tr. at 1328:17–24).

Industry Guide 3 additionally states, "No loans shall be excluded from the amounts presented . . .

." (GX 12, p. 8).

---

[7] Since before trial, the parties have disputed whether Circumstance 3 or 4 applies to the loans at issue in
this case. They have never, to my knowledge, disputed that Circumstances 1, 2, and 5 do not apply.

The Financial Statements portion is governed by Regulation S-X. (*See* Tr. at 1322:24–1323:2, 1331:12–13). Regulation S-X refers to Generally Accepted Accounting Principles ("GAAP"), codified by the Financial and Accounting Standards Board ("FASB"). (*See id.* at 1331:12–25). The relevant GAAP provision requires securities registrants to state their "policy for determining past due or delinquent status (that is, whether past due status is based on how recently payments have been received or contractual terms)." (GX 993, p. 5; Tr. at 1334:7–10).

### ii. *Ambiguity in Reporting Requirements*

As an initial matter, I previously held that the Call Report instructions were not ambiguous as a matter of law. (*See* D.I. 740). More specifically, I found that the instructions made clear that a loan's "past due status" is controlled by its "contractual repayment terms." (*Id.* at 4). I noted also that, pursuant to those instructions, banks are required to report their loans that are past due for principal or interest payment under their contractual terms in the five circumstances listed. (*Id.*). Those include Circumstance 4, pursuant to which banks must report, "Single payment notes, debt securities, and other assets providing for the payment of interest at maturity . . . as past due after maturity if interest or principal remains unpaid for 30 days or more." (GX 86A, p. 2).[8]

Defendants argue additionally, however, that the SEC reporting requirements outlined above are similarly ambiguous. (*See* D.I. 826 at 7; D.I. 828 at 20). As support, Defendants point to the testimony of the Government's SEC expert, Donald Walker. (*See* D.I. 826 at 7; D.I. 828 at 20). According to Defendant Gibson, Mr. Walker's trial testimony demonstrates that "banks are

---

[8] In arguing that the Government failed to meet its burden of proof on the falsity element, Defendant Rakowski focuses primarily on the Call Report instructions. (*See* D.I. 824 at 10–12). In my opinion, none of her arguments affect my prior analysis and ruling.

Further, in his Rule 33 motion, Defendant Gibson argues that the Government's interpretation of the Call Report instructions was "illogical." (*See* D.I. 827 at 11). I address that argument below.

forced to consider and interpret multiple open-ended (and occasionally conflicting) sources when calculating past due loans for reporting purposes." (D.I. 828 at 20). Not one of those sources, Defendants argue, defines "past due." (*Id.* at 21; D.I. 825 at 25; D.I. 826 at 7).

In my opinion, that the "sources" identified by Mr. Walker do not expressly state "a past due loan is . . ." does not mean the SEC's reporting requirements for "past due" loans are ambiguous. Nor do I think they are ambiguous because there are "multiple" sources of guidance. Rather, what is important is that the reporting requirements make clear when a loan must be reported as "past due." I think they do. As outlined above, Industry Guide 3 instructs bank holding companies to disclose their "[a]ccruing loans which are contractually past due 90 days or more as to principal or interest payments." (GX 12, p. 7). I think the plain language of that requirement makes clear that where a loan contract provides that a principal or interest payment is due and the principal or interest goes unpaid for 90 days or more beyond that date, that loan must be reported to the SEC as "past due." I am hard pressed to see how that reporting requirement is ambiguous. Indeed, other than arguing that the term "past due" is not expressly defined, Defendants do not explain how any specific word or phrase in Industry Guide 3 is subject to multiple reasonable interpretations.[9]

Nor am I persuaded by Gibson's argument that the SEC reporting requirements are ambiguous because "the limited guidance offered by these sources often actually contradicts each other." (D.I. 828 at 21). Gibson points to Industry Guide 3's reference to "contractually past due" loans and FASB 310-10-50-6(e)'s reference to "how recently payments have been

---

[9] In arguing that the Government alleged in the indictment a definition of "past due" that "was not taken from regulatory guidance or other 'fair warning' source," Defendant Rakowski seems to suggest that the word "contractual" is ambiguous. (*See* D.I. 824 at 10). More specifically, she contends, "[C]ontractual repayment terms . . . have no fixed and objective content." (*Id.*). Rakowski cites nothing to support that contention nor does she explain how, in her view, the word "contractual" is subject to multiple reasonable interpretations. Thus, it remains unclear to me what language in the relevant reporting requirements Defendants believe to be ambiguous.

8

received or contractual terms." (*Id.*). As the Government points out, however, Mr. Walker explained that FASB 310-10-50-6(e) governs banks' reporting of their significant accounting policies for determining "past due" status, and "50-7" requires them to report loans pursuant to that policy. (*See* Tr. at 1335:13–18; D.I. 829 at 18 n.7). That the SEC allows for banks to adopt a policy for determining a loan's "past due" status according to something other than the loan's contractual terms does not, in my opinion, render ambiguous Industry Guide 3's reference to "contractually past due" loans.[10]

Even assuming the SEC reporting requirements are ambiguous, however, I do not think the Bank's interpretation of those requirements is reasonable. Whether Defendants' asserted understanding of the reporting requirements is reasonable is a question of law. *See United States v. Prigmore*, 243 F.3d 1, 18 (1st Cir. 2001) ("[I]f the evidence at trial gives rise to a genuine and material dispute as to the reasonableness of a defendant's asserted understanding of applicable law, the judge, and not the jury, must resolve the dispute." (citations omitted)). Defendants maintain that a reasonable interpretation of the Bank's reporting obligations was that it could omit from its public reports matured loans that were "current for interest" and in the "process of extension."[11]

---

[10] And, as the Government points out, the evidence adduced at trial showed that the Bank did not state in its Form 10-K that it had a different policy for determining "past due status." Rather, it consistently referenced "contractual" terms in its "Loans" discussion. (*See* GX 1, p. 81).

[11] In arguing that the Government failed to prove that the Bank's interpretation of the SEC's "past due" reporting requirements was not reasonable, Defendant Gibson additionally points to a "Question and Answer" ("Q&A") from the website of the Office of Thrift Supervision ("OTS") related to the reporting of "past due" construction loans. (*See* D.I. 828 at 22). I previously held that the Schedule RC-N Call Report instructions were not rendered ambiguous by the OTS Q&A at issue. (*See* D.I. 740). I explained further that even if the instructions were ambiguous, I did not think the Q&A was a reasonable interpretation of those instructions insofar as it suggests that the "past due" status of a loan can change absent a written contract. (*See id.* at 5–6). As to SEC reporting, I think the Q&A has little (if any) relevance given that, unlike the Federal Reserve and OTS, the SEC is not a member of the Federal Financial Institutions Examination Council, and it does not use reporting instructions that mirror the OTS' instructions for reporting past due construction loans. To the extent it is relevant, however, for the same reasons explained in D.I. 740, I do not think the SEC reporting requirements are rendered ambiguous by the Q&A.

9

I disagree. Under that interpretation, a loan with principal due one year from the date of the loan need not be reported as "past due" where the principal goes unpaid for 791 days (*see* Tr. at 1888:1–3) beyond that date, that is, the loan's maturity date, so long as the loan is in the "process of extension." That interpretation ignores the plain meaning of the reporting requirements that where principal (or interest) goes unpaid for 90 days or more beyond the date it is due under the loan contract, the loan must be reported as "past due." Accordingly, I do not think the Bank's purported understanding is a reasonable interpretation of the SEC reporting requirements.[12]

In short, I think the standard was clear against which to judge the falsity of the statements at issue, both as to the Bank's Call Reports and its SEC reports. And in light of that clear standard, I believe a rational juror could have found the statements at issue false.[13]

---

Nor do I think the Q&A compels the conclusion that Defendants' interpretation of the SEC reporting requirements was reasonable.

[12] What is also unreasonable about the Bank's practice is that loans that were actually going to be extended could have been extended before the 90 days ran. There was no evidence at trial that any of the loans in the "process of extension" were actually undergoing any bona fide extension process. That is why the Government had evidence of certain loans (*e.g.*, Reybold) that the Bank continued to waive quarter after quarter.

[13] I note that, in their briefs, Defendant Rakowski and the Government cite *United States v. Syme*, 276 F.3d 131 (3d Cir. 2002). In that case, the government alleged that the defendant, in violation of federal fraud statutes and the False Claims Act, misrepresented the location of his ambulance companies' "home stations," so that he could receive Medicare and Medicaid reimbursements at a higher rate. *Id.* at 146. On appeal, the defendant argued that "the fraud that the government identified—falsifying the 'home station' of the ambulances—could not have occurred because 'home station' was not authoritatively defined during the relevant period." *Id.* at 143 n.4. The Third Circuit stated that to prove the fraud alleged, "the government needed to demonstrate that a definition of the term 'home station' existed and that [the defendant] was aware of the meaning of 'home station' when he submitted his claims for reimbursement." *Id.* at 146. After reviewing trial testimony from individuals in the "ambulance community," *id.* at 143, the court observed that "the government simply may have failed to present sufficient evidence on the definition of the term 'home station' to make out the elements of the fraud and False Claims Act charges," *id.* at 148, though it ultimately did not decide the issue.

In her reply brief, Defendant Rakowski argues, "The government attempts to cabin *Syme*'s holding to the knowledge and intent elements. . . . But *Syme* plainly requires the government to prove the objective definition of a term independently of knowledge, intent, and even motive." (D.I. 832 at 4). "And on that threshold question," she argues, "the government cites no evidence proving beyond a reasonable doubt 'the definition of the term '[past due].'" (*Id.* at 4–5). Rather, Rakowski asserts, "It merely invokes the Court's instruction, as though the instruction removed the issue from the jury." (*Id.* at 5).

I understand Rakowski to be arguing essentially that the Government failed to present sufficient evidence in regard to the definition of the term "past due." I think Rakowski's reliance on *Syme* in that regard is misplaced.

The evidence at trial showed that the Bank submitted false "past due" loan amounts in the public reports identified in the indictment, by omitting from those reports millions of dollars in loans that were 90 days or more past due for principal repayment under their contractual terms.

In its Form 10-Q for the third quarter of 2009, for example, the Bank reported only $17.4 million in loans past due 90 days or more, omitting $297,697,881.04 in 90-day past due loans from that amount. (Tr. at 4220:12–18). And, in its Form 10-K for 2009, which the Bank incorporated into its Offering Prospectus in connection with its capital raise in February 2010, the Bank reported only $10.9 million in loans past due 90 days or more, omitting $303,639,546.99 in 90-day past due loans from that amount. (*Id.* at 4220:22–4221:3).

Thus, in my opinion, the Government presented sufficient evidence on the falsity element of Counts 4 to 16.

b. Criminal Intent

Defendants further challenge their false statement and false banking entry convictions on the basis that the Government did not prove the requisite criminal intent.

---

In *Syme*, no Medicare or Medicaid regulation defined the term "home station" such that whether the term "had a meaning" was a "highly disputed issue[] of fact" at trial and in trying to prove that fact, the government offered testimony and other evidence in regard to what individuals in the "ambulance industry" understood it to mean. *See* 276 F.3d at 147. Here, on the other hand, the reporting instructions for documents filed with the SEC and the Federal Reserve unambiguously define the term "past due" by tying it specifically to the loan contract and the payment of interest or principal, and the Government introduced those instructions into evidence. (*See* GX 12; GX 86A). In my opinion, that was all the Government was required to do in this case. And, in fact, in September 2017, when Wilmington Trust was still a defendant in this case, Defendants appeared to take the position that no Government or defense witness should be permitted to testify about the meaning of the "governing regulation or the governing guidance" (*i.e.*, as to the meaning of the term "past due"). (*See* D.I. 539 at 89:6–91:2).

As to the sufficiency of the evidence in regard to the falsity of the statements at issue, what is important is that the Government proved that the loans that were excluded from the Bank's "past due" reports met the unambiguous definition in the SEC and Call Report instructions, thus making the statements at issue false. Defendants do not appear to argue that the loans waived from the public reports charged in the indictment were not "past due" under that definition. Indeed, the Government presented substantial evidence that they were. And as to the Bank's Call Reports in particular, I think the Government presented sufficient evidence at trial from which a reasonable juror could find that the loans at issue met Circumstance 4 in the Call Report instructions, and thus needed to be reported as "past due" in those reports. (*See, e.g.*, Tr. at 6019:6–6028:22; GX 1038).

As to Counts 5 and 11 to 16, the Government was required to prove that each Defendant acted knowingly and willfully. *See* 18 U.S.C. § 1001; *United States v. Starnes*, 583 F.3d 196, 209–12 (3d Cir. 2009). That meant it needed to prove that Defendants acted "deliberately and with knowledge" that the Bank's representations in regard to its amount of loans that were past due 90 days or more were false, and that Defendants were aware "at least in a general sense" that their conduct was unlawful. *See Starnes*, 583 F.3d at 212.[14]

Viewing the evidence as a whole and in the light most favorable to the Government, I think there is sufficient circumstantial evidence from which a rational jury could have found beyond a reasonable doubt that each Defendant acted with the requisite criminal intent under that standard.

At trial, the Government established that the Bank had a practice of omitting from its regulatory reports filed with the SEC and the Federal Reserve matured loans that were designated as "current for interest" and in the "process" of "extension" or "renewal," despite those loans being 90 days or more past due for principal repayment under their contractual terms. (*See, e.g.*, Tr. at 1550:13–1552:12, 1863:1–15, 2839:19–2840:6, 3869:22–3870:17). Defendants

---

[14] Defendant North argues that this case "falls within the 'highly technical' bucket" line of cases under which "willfully" is read to require proof that the defendant actually knew of the specific law prohibiting his or her conduct. (D.I. 825 at 45); *Starnes*, 583 F.3d at 211. As the Third Circuit has explained, "willfully" is read to require such proof only in "rare instances involving highly technical statutes that present the danger of ensnaring individuals engaged in apparently innocent conduct, such as the federal criminal tax and antistructuring provisions." *Starnes*, 583 F.3d at 211. North essentially argues that the reporting requirements as to Call Reports are "highly technical" because the Government hesitated in responding to my question about the relationship between the five circumstances in the Schedule RC-N instructions. He asserts further that the fact that the parties disputed the meaning of the Call Report instructions suggests they are "highly technical." I am not persuaded. That there may have been some disagreement over the Call Report instructions and how the five circumstances relate to one another does not, in my opinion, make this case one of those "rare instances" in which criminal willfulness is subject to its "strictest interpretation." *See id.*

12

Gibson, Harra, North, and Rakowski were each aware of that practice. (*See, e.g.*, GX 418; GX 476/476A; GX 524).

In regard generally to the process of waiving loans, Tosha Styles, a reporting manager in the Bank's asset review group, explained essentially that the practice began with a document known as the "Delinquency Report." (*See* Tr. at 1846:11–1853:10, 1849:7–1855:13, 1867:1– 1871:24). That report was generated using "past due" loan information from the Bank's internal loan accounting system, known as "SHAW." (*Id.* at 1850:22–1851:8). The Government presented evidence at trial supporting the reasonable inference that Defendants were generally aware of the SHAW system (*see* GX 418; GX 472), and understood that SHAW tracked the Bank's loans using loan "documentation . . . input onto" the system (*see* GX 418). The Delinquency Report was separated into two sub-reports, which were filtered such that loans that were "waived" from the Delinquency Report were not subsequently included in the Bank's total amount of "past due" loans submitted in its public reports. (*See* Tr. at 1867:1–1881:13). The Delinquency Report was provided to the Controller's office. (*Id.* at 1836:20–1837:1). The Controller's office used the data from that Report to create the Bank's report of "Past Due and Nonperforming Loans," known as the "Past Due Report." (*Id.* at 2835:3–2840:6). I think this evidence shows that the Bank's process, starting with the Delinquency Report and ending with the Past Due Report, served no other purpose than to prepare the amount of "past due" loans to be reported in the Bank's public filings.

Further, the Government presented evidence at trial supporting the reasonable inference that each Defendant was aware that the amount of "past due" loans in the Past Due Report, which excluded "waived" loans, was ultimately reported in the Bank's SEC reports, Call Reports, and monthly regulatory reports filed with the Federal Reserve. (*See id.* at 2839:19–

2841:19). Thus, they each understood how the Waiver Practice impacted the Bank's public reports. And, as noted above, the Government presented substantial evidence demonstrating the extent of that impact during the relevant time period.

Evidence adduced at trial demonstrated further that Defendants were aware that the practice of waiving matured, current-for-interest loans from Wilmington Trust's public reports "just because a renewal was 'in process,'" was a "decades old issue" at the Bank. (*See* GX 418, p. 2). And in January 2010, that "long-standing problem" was "unfortunately . . . on the 'radar screen' of [the Bank's] internal and external auditors." (*Id.*, p. 1). In an email dated January 10, 2010, Richard Conway, the Bank's chief operations officer for the mid-Atlantic market, wrote to Defendants and other Bank employees, that to "fix[]" the problem by April 30th, the goal was to get "all 1,253 loans renewed/extended to appropriate new maturity dates." (*Id.*).

Further, in January 2010, plans were underway at the Bank to phase out the practice of waiving matured loans. (*See id.*). The Government presented evidence from which a reasonable jury could have inferred that Defendants North, Harra, and Gibson participated in the process of eliminating the practice. (*See* GX 473 (North writing to Gibson, Harra, and Ted Cecala, "Obviously during our conversation the week before last it was decided that we would not waive a matured/current loan if documents were not executed.")). The Bank continued to waive matured loans, however, throughout the second quarter of 2010. (*See* GX 421). Further, in its Form 10-Q for the first quarter of 2010, the Bank stated that "[m]ost of the increase" in the Bank's "commercial construction loans past due 90 days or more" was "associated with commercial construction loans that are performing, have matured but have not paid off, and for which underwriting extensions are underway." (Tr. at 2934:6–12). Thus, the Bank was telling the public that "past due" loans included "waived" loans, which (1) indicated an understanding

14

that "waived" loans needed to be reported as "past due," and (2) at the same time, showed that what the Bank actually did was contrary to that understanding.

Evidence presented at trial showed that the Bank ultimately eliminated the Waiver Practice in approximately July 2010. (*See, e.g.*, GX 421). Defendants did not inform federal regulators that the Bank's practice for reporting "past due" loans had changed. (*See, e.g.*, Tr. at 3016:1–23).[15]

The Government also presented the following evidence relevant to each individual Defendant. I address Gibson's, Harra's, North's, and Rakowski's *mens rea* in turn.

**Defendant Gibson** was the Chief Financial Officer ("CFO") of Wilmington Trust during the relevant time period. (*E.g.*, GX 435, p. 22). As CFO, Gibson "was in charge of all finance functions" for the Bank. (Tr. at 3678:8–14). Ellen Roberts, the Bank's director of investor relations, testified that in preparing Wilmington Trust's public filings, she "sought [the most] input from Mr. Gibson and other members of his staff or Ms. Rakowski's staff." (*Id.* at 3607:8–15). Evidence at trial also supported the inference that Gibson had familiarity with the Bank's reporting obligations in Call Reports. (*See* GX 534). Gibson, along with Defendant Rakowski, made the final decisions in regard to the Bank's financial reporting in SEC reports and Call Reports. (*Id.* at 3679:1–5). Further, as CFO, Gibson signed those reports, either electronically or in hard copy. (*E.g.*, GX 1, GX 76).

---

[15] I note that in addition to the evidence described above, the Government presented substantial evidence in regard to the dire state of the Delaware economy during the relevant time period, the Bank's declining financial position and deteriorating loan portfolio, the Federal Reserve's findings following its 2009 full-scope examination of the Bank, which, among other things, described the Bank's condition as "less than satisfactory," and Defendants' awareness of those various facts. In its omnibus response, the Government cites much of this evidence in arguing that it presented sufficient evidence from which a rational jury could find that Defendants acted willfully and/or with intent to deceive. (*See* D.I. 829 at 40–44). In my opinion, that evidence is not so much relevant to Defendants' criminal intent as it is to their motive to lie. And I believe the jury would have been justified in considering it for that purpose. On *mens rea*, about the most that can be said is that, in light of this evidence, the Bank's amount of 90 day past due loans staying approximately the same should have raised a red flag. But because I do not find the evidence more than tangentially relevant to Defendants' *mens rea*, I do not include it in my analysis of that element.

15

that "waived" loans needed to be reported as "past due," and (2) at the same time, showed that what the Bank actually did was contrary to that understanding.

Evidence presented at trial showed that the Bank ultimately eliminated the Waiver Practice in approximately July 2010. *(See, e.g.*, GX 421). Defendants did not inform federal regulators that the Bank's practice for reporting "past due" loans had changed. *(See, e.g.*, Tr. at 3016:1–23).[15]

The Government also presented the following evidence relevant to each individual Defendant. I address Gibson's, Harra's, North's, and Rakowski's *mens rea* in turn.

**Defendant Gibson** was the Chief Financial Officer ("CFO") of Wilmington Trust during the relevant time period. *(E.g.*, GX 435, p. 22). As CFO, Gibson "was in charge of all finance functions" for the Bank. (Tr. at 3678:8–14). Ellen Roberts, the Bank's director of investor relations, testified that in preparing Wilmington Trust's public filings, she "sought [the most] input from Mr. Gibson and other members of his staff or Ms. Rakowski's staff." *(Id.* at 3607:8–15). Evidence at trial also supported the inference that Gibson had familiarity with the Bank's reporting obligations in Call Reports. *(See* GX 534). Gibson, along with Defendant Rakowski, made the final decisions in regard to the Bank's financial reporting in SEC reports and Call Reports. *(Id.* at 3679:1–5). Further, as CFO, Gibson signed those reports, either electronically or in hard copy. *(E.g.*, GX 1, GX 76).

---

[15] I note that in addition to the evidence described above, the Government presented substantial evidence in regard to the dire state of the Delaware economy during the relevant time period, the Bank's declining financial position and deteriorating loan portfolio, the Federal Reserve's findings following its 2009 full-scope examination of the Bank, which, among other things, described the Bank's condition as "less than satisfactory," and Defendants' awareness of those various facts. In its omnibus response, the Government cites much of this evidence in arguing that it presented sufficient evidence from which a rational jury could find that Defendants acted willfully and/or with intent to deceive. *(See* D.I. 829 at 40–44). In my opinion, that evidence is not so much relevant to Defendants' criminal intent as it is to their motive to lie. And I believe the jury would have been justified in considering it for that purpose. On *mens rea*, about the most that can be said is that these factors would have raised a red flag that the Bank's amount of 90 day past due loans stayed approximately the same. But because I do not find it more than tangentially relevant to Defendants' *mens rea*, I do not include it in my analysis of that element.

15

At trial, the Government presented evidence regarding Gibson's own understanding of the term "past due." In particular, the Government introduced a July 7, 2010 email in which Gibson wrote in regard to matured, current-for-interest loans that had not been extended or renewed with loan documentation, "Those are past due! We need those loans where we have executed agreements. . . . The maturity dates are known. These should be done at least 30 days in advance to allow for the documentation process to happen. We need to discuss accountability." (GX 421). The Government also introduced a statement made by Gibson during a July 23, 2010 earnings conference call. During that call, Gibson remarked that certain loans were "current on interest, but technically, because they have matured, they are past due their principal. . . . But, as a technical matter, a matured loan is past due principal." (GX 104R, p. 22).

In arguing that the Government failed to prove that he acted with the requisite criminal intent, Gibson argues, "[T]he government relied exclusively on [these] two statements . . . both of which were taken out of context and made by Mr. Gibson after the conspiracy period, addressing the Bank's definition of 'past due loans' only after the Bank eliminated its waiver practice." (D.I. 828 at 15 (emphasis omitted)).

First, the Government did not rely solely on the two statements made by Gibson during July 2010. Rather, it also presented the various pieces of evidence cited above, which, considered together and in the light most favorable to the Government, support the reasonable inference that Gibson was sufficiently familiar with the Bank's SEC and Federal Reserve reporting obligations such that he understood the Bank was required to report its loans that were contractually past due for principal repayment, and knew that by omitting certain contractually past due loans via the Waiver Practice, the Bank misrepresented its amount of "past due" loans

in documents filed with federal regulators. That evidence further supports the reasonable inference that Gibson understood that failing to report accurately the Bank's amount of "past due" loans was unlawful. Second, the conspiracy period charged in the Third Superseding Indictment is October 2009 through November 2010. (D.I. 243 ¶ 65). Thus, Gibson's statements made in July 2010 fall within the relevant time period. Third, while both statements were made around the time the Bank chose to eliminate the Waiver Practice, I think the jury could nonetheless have reasonably inferred that those statements reflected Gibson's understanding of the term "past due" just several months prior. The applicable reporting requirements did not change. The only thing that changed was that Gibson and the others decided to change the Bank's practices in complying with those requirements.

Gibson additionally argues that none of the evidence presented by the Government showed "secrecy" around the Waiver Practice or otherwise demonstrated that Defendants concealed that practice from auditors or federal regulators. (D.I. 828 at 13–18). Indeed, evidence adduced at trial showed that the Waiver Practice was long-standing and widely known and discussed throughout the Bank. (*E.g.*, Tr. at 4041:19–23, 1713:19–1714:11). Further, evidence showed that the Bank provided documents to auditors and federal examiners alluding to the Waiver Practice (*see, e.g.*, *id.* at 2672:18–2674:8 (examiner James Corkery acknowledging that a document in the Federal Reserve's work papers describes the Bank's Waiver Practice)), and documents from which examiners could glean the practice's impact on the Bank's public reports (*see, e.g.*, *id.* at 2604:17–2606:15 (Mr. Corkery acknowledging that the Federal Reserve received a commercial loan download from the Bank which contained loans waived in March 2009)). Additionally, as Gibson points out, no former Bank employees testified that he or any other Defendant instructed them to conceal the practice from individuals outside the Bank.

17

I do not disagree with Gibson that this evidence undermines the Government's theory that Defendants concealed the Waiver Practice from the Bank's auditors and federal regulators. Nor do I disagree that this evidence lends support to Gibson's good faith defense at trial. A reasonable juror, however, could have given less weight to this "good faith" evidence and more weight to the other pieces of evidence presented by the Government in assessing Gibson's (and the other Defendants') criminal intent. As explained above, the Government presented evidence not only demonstrating Gibson's awareness of the Bank's reporting obligations as to SEC and Federal Reserve filings but also showing his own understanding of the term "past due," which understanding was consistent with the meaning of "past due" for reporting purposes.

**Defendant Harra** was the President of the Bank and its Chief Operating Officer ("COO") during the relevant time period. (*See, e.g.*, GX 1; GX 435, p. 22). As President and COO, Harra "specialized in all aspects of commercial and personal financial services." (GX 435, p. 22). Further, he "overs[aw] all banking activities for the company." (*Id.*). Harra was also a member of the Bank's board of directors and signed the Bank's SEC reports and signed and certified its Call Reports. (*E.g.*, GX 1; GX 77).

Following the Federal Reserve's 2009 full-scope examination of the Bank, Wilmington Trust entered into a Memorandum of Understanding ("MOU") pursuant to which the Bank was required to submit to the Federal Reserve its amount of "past due" loans on a monthly basis. As President and COO, Harra signed the MOU. (*See* GX 283, p. 8). Shortly thereafter, on October 26, 2009, Harra wrote to Defendant North, among others: "'[M]atured' commitments, renewals, or loans that require extensions need to be worked-on currently, and kept current and up-to-date!" (GX 492).[16]

---

[16] In his reply brief, Defendant Harra argues, "The only rational reading of th[is] email in its entirety is that Mr. Harra considered 'past due' (or delinquent) loans to be something entirely apart from matured loans." (D.I. 836

As noted above, the Government presented evidence from which a reasonable jury could have inferred that Harra was involved in the process of eliminating the Waiver Practice. In an April 8, 2010 email, for example, Defendant North wrote to Harra, Defendant Gibson, and the Bank's Chief Executive Officer, Ted Cecala, "Obviously during our conversation the week before last it was decided that we would not waive a matured/current loan if documents were not executed." (GX 473).

Further, in a March 25, 2010 email, responding to Defendant North's concern that "DE [relationship managers] never documented the 4/1/10 extensions. What we don't want are the Feds seeing a skew of matured loans on SHAW. They've never commented on matureds in the past, but I want to give them no opportunity in the future," Harra wrote: "Ugggh. Got it. No need for further elaboration!" (GX 472). Additionally, responding to a June 11, 2010 email containing the Bank's May 2010 Past Due Report, Harra asked Defendant North, "What's with the increase in 'Real Estate-Construction' from March 31 to May 31?" (GX 588). North responded, "A good deal of it is matured/current loans that are in the renewal/extension process. . . . [T]he level of matured/current has increased from April to May, but a game plan is in place for addressing these by quarter end (i.e. approved, documented and executed)." (*Id.*).

In arguing that the Government failed to prove he acted with the requisite criminal intent, Harra asserts that the Government introduced no evidence suggesting that anyone at the Bank

at 19). As Harra points out, he wrote in the first paragraph of the email, "[F]ocus on commercial delinquencies on a month-end basis . . . by contacting past due commercial clients on a monthly basis." (*Id.* at 18 (emphasis omitted)). Only in the second paragraph does he refer to "'matured' commitments." (*See* GX 492). I note this is not the only email presented at trial in which Bank employees, including Defendants, referred to "past due" and "matured" loans separately. As to this email and others, the Government argued to the jury that it should draw certain inferences in regard to Defendants' state of mind, while Harra and the other Defendants argued it should draw other inferences, like the one advanced by Harra now. In my opinion, a reasonable jury would have been justified in accepting the Government's view of this evidence and rejecting Defendants' view. And assuming that I disagree with the jury, it would be improper for me to weigh the evidence or to substitute my judgment for that of the jury. *See Brodie*, 403 F.3d at 133.

ever shared any concern with him over the Bank's public reporting practice. (D.I. 826 at 7). He maintains also that the evidence at trial showed that Harra was neither involved in preparing the "past due" loan data included in the Bank's public reports nor was "viewed as [] having any skill in the interpretation of the various reporting regulations." (*Id.* at 8 (citations omitted)). Indeed, he points out, he was not a member of the Bank's Disclosure Committee, which had "the primary responsibility for ensuring that the Bank's public financial disclosures . . . were made in accordance with the relevant standards." (*Id.* at 12 (citations omitted)). Harra argues further that the fact that he was "President of the Bank cannot substitute for the complete absence of evidence that he was aware of the regulatory definitions of 'past due.'" (*Id.* at 13). According to Harra, "There is absolutely no direct evidence . . . to buttress [the Government's] argument that Mr. Harra had even an inkling as to the salient definitions or the potential[] falsity of the Bank's public reports of its past due loans." (*Id.*).

As an initial matter, the Government was not required to prove Defendants' criminal intent through direct evidence. *See Starnes*, 583 F.3d at 213. A jury may find the requisite intent by drawing reasonable inferences from evidence of a defendant's words and conduct. *See id.* (citations omitted). Nor was the Government required to prove that Harra (or any Defendant) knew of the specific regulations governing his conduct. *See id.* at 212.

Further, while I agree with Harra that his role as President of the Bank would not, alone, be sufficient evidence from which to infer his criminal intent, I think a reasonable juror could have considered Harra's position at the Bank in assessing the other evidence presented by the Government. *Cf. Brodie*, 403 F.3d at 150 (stating that in assessing whether defendant was guilty of conspiracy, "a rational jury could legitimately [have] use[d]" the company structure including

20

fact that defendant was the company President, "as a prism through which to assess all of the other circumstantial evidence presented against the [d]efendant").

In any event, while Harra did not prepare the Bank's "past due" loan data, was not shown to have any expertise in regulatory reporting, and was not a member of the Disclosure Committee, I think a reasonable juror could nonetheless have found that Harra acted with the requisite criminal intent by drawing reasonable inferences from the other pieces of evidence described above. In my view, that evidence, considered together with all the other evidence presented at trial, supports the reasonable inference that Harra understood that the Bank was required to report as "past due" its loans that were past due for principal repayment under their contractual terms (*i.e.*, its matured loans), and that so long as the Waiver Practice was in place, the Bank was not accurately reporting its "past due" loans. In other words, I think the jury would have been justified in giving less weight to the evidence suggesting Harra was not well-informed about the Bank's reporting obligations and more weight to the evidence suggesting that he was sufficiently informed of those obligations such that he understood the meaning of "past due" for reporting purposes.

The Government additionally showed that Harra signed the Bank's SEC reports (*e.g.*, GX 1) and signed and certified that he "examined" its Call Reports and that they were "to the best of [his] knowledge and belief . . . prepared in conformance with the instructions issued by the appropriate regulatory authority and are true and correct" (GX 76). This further supports the reasonable inference that Harra was aware of the Bank's obligation to report its amount of loans that were contractually past due for principal and that failing accurately to report that amount was unlawful.

**Defendant North** was the Chief Credit Officer of the Bank during the relevant time period. (*E.g.*, Tr. at 2343:25–2344:3). In that role, North was responsible for the Delinquency Report and approving the waiver of loans from that Report. (*See id.* at 2055:24–2057:2, 1921:20–1924:23; GX 448).

At trial, the Government introduced several emails from 2008 showing that North was aware of the Bank's public reporting obligations and understood that waiving loans impacted its public reports. (*See, e.g.*, GX 487). During that time period, North also expressed concern about the Bank's practice of waiving matured loans that had not been approved and documented. (*See id.*). In June 2008, he wrote, as to matured, current-for-interest loans, "[I]f we've completed our approval process on these. But the documentation has not gotten processed, I'm OK waiving. All other 'I'm working on it' situations are not ones that we should be waiving." (*Id.*).

The Government also introduced evidence showing that North was on notice that the Bank's handling of its matured loans was a concern. In September 2009, for example, Karen Thuresson, an employee in the credit risk management group, wrote to North and other Bank employees, "The level of loans which have matured 90+ days needs to be better managed. . . . (A maturity billing is a principal billing, and to the extent the maturity is not addressed, principal is delinquent. That delinquency grows until the loan is repaid or otherwise extended.) . . . For now, I am explaining that an 'extension is in process' as a means to avoid unnecessary transfers of these loans to nonaccrual. In this era of SOX and second-guessing, I do not think this can continue for much longer." (GX 442). Further, Ms. Styles testified that she expressed both to North and Defendant Gibson that she thought waiving matured loans "might be a concern or a problem." (*See* Tr. at 1894:12–14, 1895:5–14). She explained that she was particularly

22

concerned "about the maturity date and the dates being so long that there should be a renewal within a certain period of time." (*Id.* at 1894:25–1895:2).

Further, evidence at trial demonstrated that North was aware that renewals or extensions of matured loans were required to "allow[] the system to report a true past due number without a lot of adjustments that could raise issues for us in the future." (GX 446). And responding to Defendant Harra's question in regard to the "needed documentation" in order to extend a matured loan on the SHAW system, North stated in a March 25, 2010 email, "[W]e're talking about a Change in Terms for LaserPro deals or some sort of Modification Agreement." (GX 472).

Evidence presented by the Government also showed that North was involved in the Bank's plan to eliminate the Waiver Practice. In a March 24, 2010 memorandum addressed to Defendant Harra and Mr. Cecala, for example, North wrote, "Effective 12/31/2009, we decided that relative to Past Dues, that we would only 'waive' loans that had one of three characteristics: 1) Handled by Loan Recovery, 2) Bank error, 3) Had been approved by WTC, but not yet documented and/or booked on SHAW." (GX 476A, p. 1). He additionally wrote as to the "looming issue" of "matured and/or maturing Loans, principally CRE loans in DE," that "[o]ur guys need more time to get through this process and to do it the 'right' way." (*Id.*). In regard to an "Action Plan" for addressing the Bank's number of matured and maturing loans, he wrote, "What will also be imperative is that these extensions be followed up by the full execution of any required documentation in order to get those loans updated on SHAW." (*Id.*, p. 2). On January 10, 2010, North also had written to Defendants Rakowski, Gibson, and Harra, among other Bank employees, explaining efforts at the Bank to change the practice of waiving loans. (*See* GX 418). Specifically, he wrote, "What we said was that if the loan in question had been properly

23

approved internally (documentation may not have been executed or input onto SHAW) or was handled in Loan Recovery . . . that we would waive those situations. . . . Not perfect, but this is a first for us and I think reflects the efforts of a lot of people committed to getting this right." (*Id.*, p. 2).

I think a reasonable juror could infer from this evidence that North understood that loans that were past due for principal repayment, that is, matured, needed to be reported as "past due" in the Bank's public filings, absent a documented extension or renewal. Further, I think a juror could have reasonably inferred from North's involvement in the elimination of the Waiver Practice, and, in particular, the statements he made during the process of eliminating the practice, that he knew the Waiver Practice caused the Bank to misrepresent in its public reports its amount of "past due" loans and that he was aware, "at least in a general sense," that misrepresenting that amount to federal regulators was unlawful. *See Starnes*, 583 F.3d at 212.[17]

**Defendant Rakowski** was a certified public accountant and Controller of the Bank during the relevant time period. (*See* Tr. at 1836:23–1837:1, 3677:1–3). As Controller, Rakowski "was in charge of all accounting related matters for the company." (*Id.* at 3677:15–16). That meant she, along with Defendant Gibson, made the final decisions in regard to the Bank's financial reporting in its SEC reports and Call Reports. (*See id.* at 3679:1–5). At trial, the Government presented evidence showing that Rakowski also prepared quarterly memoranda for the Bank's board of directors in regard to the Bank's regulatory reporting obligations and

---

[17] I note that Defendant North's principal argument in regard to the criminal intent element underlying the false statement counts, is that the Government was required and failed to prove that North was aware of the specific regulations governing his conduct. (*See* D.I. 825 at 44–45). As I explained in footnote 14, however, I do not agree with North that this case falls within the narrow category of cases in which courts have read criminal willfulness under its strictest interpretation.

changes in the reporting landscape. (*E.g.*, GX 740; GX 835). She signed the Bank's Form 10-K for 2009. (*See* GX 1).

Rakowski appears to argue that this evidence shows only that she "perform[ed] her duties as controller." (D.I. 824 at 23). Viewed in the light most favorable to the Government, however, I think this evidence supports the reasonable inference that Rakowski was well-informed about the Bank's reporting obligations such that she knew the Bank was required to report its loans that were past due for principal under their contractual terms, that is, that she knew the relevant "past due" standard, and thus knew that omitting such loans would cause the Bank to misrepresent its amount of "past due" loans. *See Starnes*, 583 F.3d at 212–13 (noting that, "in the context of the totality of the evidence in the record," a juror could reasonably infer the defendant's criminal intent in a § 1001 prosecution from evidence of the defendant's prior experience and familiarity with federal asbestos regulations). It further supports the reasonable inference that Rakowski was aware that omitting contractually past due loans from the Bank's public reports was, "at least in a general sense," unlawful. *See id.*

The Government also presented evidence supporting the inference that Rakowski knew of the Bank's obligation to report its "past due" loans to the Federal Reserve on a monthly basis pursuant to the October 2009 MOU. (*See* Tr. at 3727:1–4). Prior to the first reporting month under the MOU, Rakowski requested from assistant controller, Micos Slijepcevic, "the waivers that were made in Sept. by category." (GX 523). The email she eventually received from Mr. Slijepcevic, titled "Waived loans for past due reporting," included a table showing a gross "waived" loans "90+" amount of $397.8 million, $338.95 million of which were "matured and zero interest owing." (*See* GX 524, p. 1).

Further, on November 16, 2009, Rakowski received the Bank's October 2009

Delinquency Report, which listed over $300 million in waived loans that "were not included" in

the Bank's "final numbers." (GX 574; GX 574A). Rakowski subsequently forwarded the email

to Defendant Gibson, and stated, "We did pull the waived loans from the Past Due report." (*Id.*).

In my view, a jury could reasonably infer from this evidence that Rakowski understood

how the Waiver Practice impacted the Bank's public reports, that is, that it caused the Bank to

omit from its public filings loans that were past due 90 days or more under their contractual

terms. Thus, together with the evidence above regarding Rakowski's knowledge of the Bank's

reporting obligations, a jury could further draw the reasonable inference that Rakowski knew that

the Waiver Practice caused the Bank to misrepresent its amount of "past due" loans in its public

reports.

Rakowski argues that the evidence adduced at trial showed that neither she, nor her

colleagues, thought that the Bank's use of the term "past due" was false. (D.I. 824 at 15). She

points to the testimony of Mr. Conway, Ms. Styles, and Stephen Cummings, a credit policy risk

manager at the Bank, who each testified essentially that, at Wilmington Trust, "waived" loans

were not considered to be "past due." (*See id.*). That the Bank had an internal policy of not

treating "waived" loans as "past due," and various Bank employees were aware of that policy,

does not mean, however, that Rakowski did not know that the policy caused the Bank to omit

from its public filings loans that were "past due" under the reporting requirements with which

Rakowski was sufficiently familiar.

Rakowski argues further, "The Government consistently conflated [her] knowledge" of

the Bank's obligation to report "past due" loans, the Waiver Practice, the worsening economic

conditions in 2009, and the Bank's efforts to address challenges in the loan portfolio, "with

intent to commit the crimes charged – a position that attempts to build criminal intent out of innocent knowledge." (*Id.* at 20; *see also id.* at 21–22).

As an initial matter, I agree with Rakowski that evidence showing that she was aware of the Bank's deteriorating loan portfolio and the worsening economy would not be sufficient evidence from which a reasonable jury could have found that she acted with the requisite criminal intent. As I explained earlier, however, I think that evidence is not so much relevant to Rakowski's or the other Defendants' knowledge and willfulness as to the Bank's false "past due" loan submissions, as it is to their motive to lie. In any event, as explained above, I think the jury would have been justified in drawing the inference not merely that Rakowski knew of the Bank's obligation to report its "past due" loans, but that she knew specifically what that obligation meant. In other words, she knew that the Bank, in its Call Reports and SEC reports, needed to report loans that were past due for principal under their contractual terms, that is, matured. And given that she was aware the Bank omitted such loans from its public filings via the Waiver Practice, a reasonable jury could have further inferred that she knew the Bank mispresented its amount of "past due" loans in its public filings.

### ii. *Counts 4 and 6 (15 U.S.C. §§ 78m(a) & 78ff)*

As to Counts 4 and 6, the Government was required to prove that Defendants acted knowingly and willfully, and with the intent to deceive or defraud. *See* 15 U.S.C. § 78ff(a); *United States v. Kaiser*, 609 F.3d 556, 567–70 (2d Cir. 2010).

I have already concluded that the Government presented sufficient evidence from which a rational jury could have found that Defendants acted knowingly and willfully with respect to the false statement charges brought pursuant to 18 U.S.C. § 1001. For the same reasons stated in regard to those counts, I think a reasonable jury could find that Defendants acted knowingly and

willfully under 15 U.S.C § 78ff(a). Similarly, I think a jury could reasonably infer that Defendants acted with intent to deceive or defraud. Assuming that a rational jury concluded that Defendants knowingly and willfully made or caused to be made false statements to the SEC and the Federal Reserve, I think such a jury could also draw the inference that Defendants acted with intent to deceive in making those statements. *Cf. United States v. Boyer*, 694 F.2d 58, 59–60 (3d Cir. 1982) (finding it "proper to charge that the specific intent to deceive may be found from a material misstatement of fact made with reckless disregard of the facts" in mail and securities fraud case).

### *iii. Counts 7 to 10 (18 U.S.C. § 1005)*

As to Counts 7 to 10, the Government was required to prove that Defendants acted knowingly and with the intent to deceive. *See* 18 U.S.C. § 1005.

Again, in light of my conclusion above with respect to the § 1001 charges, I think a rational juror could have found from the evidence presented at trial that Defendants acted knowingly with intent to deceive as to Counts 7 to 10.

### c. Accomplice Liability (North)

Defendant North was charged as an accomplice pursuant to 18 U.S.C. § 2(a) with respect to Counts 4 to 16.

In addition to arguing that he lacked the requisite criminal intent underlying those counts, North argues that the trial record is devoid of any evidence that he "perform[ed] an affirmative act that caused external reporting to exclude the [waived] loans . . . from the Bank's publicly-reported past due numbers." (D.I. 825 at 46). The core of North's argument seems to be that he was not sufficiently involved in the process of waiving loans or reporting of the Bank's amount

28

of "past due" loans, to be held criminally liable for aiding and abetting anyone in falsely reporting those amounts. (*See id.* at 46–47).

"In order to convict a defendant of aiding and abetting the commission of a crime, the government must prove: (1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with the intent to facilitate it." *Soto*, 539 F.3d at 194. Further, as the Third Circuit stated in *United States v. Dixon*,

> In order to aid and abet . . . a defendant must do more than associate with individuals involved in the criminal venture. (He must) participate in (the criminal enterprise) as something he wishes to bring about and that he seeks by his action to make succeed . . . Mere presence at the scene of the crime, even in the company of one or more of the principal wrongdoers, does not alone make one an 'aider and abettor,' unless the jury is convinced beyond a reasonable doubt that (the) defendant (did) something to forward the crime and that he was a participant rather than merely a knowing spectator.

658 F.2d 181, 189 (3d Cir. 1981) (citations omitted).

In this case, I think the Government presented sufficient evidence from which a rational jury could have found that North facilitated the making of the false statements and banking entries alleged in Counts 4 to 16.

At trial, the Government elicited testimony from Mr. Cummings, who stated that Defendant North approved the Delinquency Report, that is, the Report in which certain matured loans were designated with a "Y" signaling that those loans would be waived from the Bank's "past due" numbers, before that Report was sent to the Controller's office. (*See* Tr. at 2055:13–2056:24). And as noted earlier, the evidence at trial regarding the Bank's reporting practices supports the conclusion that the Delinquency Report was used solely to prepare the Bank's loan amounts so that they could comply with its reporting obligations.

29

Mr. Cummings additionally explained that to obtain North's approval, he would "either e-mail[] him a copy [of the Report] or print[] one out and t[ake] one over to him." (*Id.* at 2056:25–2057:2). The Government introduced into evidence a March 9, 2010 email, in which North wrote, "I approve," in response to Mr. Cumming's statement that he was "looking for approval to release today," referring to the Bank's 2-28-10 Delinquency Report. (GX 504). The body of the email stated also, "Here is the list after consideration of all waived items." (*Id.*). The Government introduced additional emails supporting the reasonable inference that North approved the Delinquency Report, which included waivers. Indeed, in a June 2008 email, North explained to other employees at the Bank the situations in which he would be "OK waiving." (GX 487).

I think a reasonable jury could have inferred from this evidence that North facilitated the false statements and false banking entries charged in Counts 4 to 16—namely, by approving the Bank's Delinquency Reports and thus loan "waivers." That the Government did not present evidence showing that North's approval of the Delinquency Report was "required," that he was the Bank's "decider" for "past due" loan calculations, or that he was involved in "all past due public reporting decisions" (*see* D.I. 825 at 46–47), does not, in my opinion, mean that a rational juror could not have found that he acted as a participant by doing "something to forward the crime." *See Dixon*, 658 F.2d at 189. Thus, contrary to North's contentions, I think the Government presented sufficient evidence from which a reasonable jury could have found that North aided and abetted the conduct charged in Counts 4 to 16.

## 2. Securities Fraud

Defendants challenge their convictions as to Count 2 of the indictment, which alleged that from approximately December 2009 to February 2010, Defendants committed securities

fraud in violation of 18 U.S.C. § 1348. The Government's securities fraud allegations were tied to Wilmington Trust's February 2010 capital raise.

To sustain a conviction under § 1348, "The Government need only prove one of [its] two subsections." *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010). Under the first subsection, the Government must provide sufficient evidence to establish: "(1) [that Defendants] had fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security." *Id.*; *see* 18 U.S.C. § 1348(1). Alternatively, under the second, it can show that Defendants "executed (1) a scheme or artifice; (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property; while possessing (3) fraudulent intent." *Hatfield*, 724 F. Supp. 2d at 324; *see* 18 U.S.C. § 1348(2).

"False representations or material omissions are not required for a conviction under § 1348(1)." *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012). Thus, a jury can convict a defendant under § 1348 without considering false representations. *Id.* To the extent a securities fraud count is based upon false representations, however, the Government must prove they are material. *See Hatfield*, 724 F. Supp. 2d at 324.

The Government charged Defendants with violating § 1348 generally, and alleged a scheme to defraud theory under subsection (1) and a false or fraudulent representations theory under subsection (2). Accordingly, I instructed the jury on both subsections, and I explained that to find Defendants guilty of Count 2, it had to be unanimous in regard to which theory of securities fraud it determined that the Government proved at trial. (Tr. at 6835:8–6838:12). Further, regarding the Government's theory under subsection (1), I instructed the jury that the indictment alleged that the scheme to defraud was carried out by making materially false or fraudulent statements, representations, claims, or documents, and directed the jury specifically to

the Bank's SEC Form 10-K for 2009. (*Id.* at 6838:25–6839:6). As to the Government's theory under subsection (2), I instructed the jury that it could only consider three specific statements found on page 55 of the Bank's SEC Form 10-K for 2009. (*Id.* at 6844:14–6845:9). Two of those statements related to the Bank's amount of reported loans past due 90 days or more. (*See* GX 1, p. 55). The third related to why, according to the Bank, its "amount of loans past due 90 days or more was lower at year-end 2009 than at year-end 2008." (*Id.*).

Defendants argue that the jury's verdict as to Count 2 cannot stand because the Government "failed to prove the requisite criminal intent or falsity." (*See* D.I. 828 at 34; *see also* D.I. 825 at 42–44). Defendant Gibson additionally argues that the Government failed to prove the materiality of statements other than the Bank's amount of "past due" loans, upon which Count 2 was also based. (*See* D.I. 828 at 35–37).

### a. Criminal Intent

As to criminal intent, the Government was required to prove that Defendants acted with fraudulent intent, *Hatfield*, 724 F. Supp. 2d at 324, which meant that it needed to prove that they acted knowingly and with the intent to deceive, *cf. United States v. Leahy*, 445 F.3d 634, 644 (3d Cir. 2006) (agreeing with district court's instruction in bank fraud case, which stated in part, "To act with intent to defraud means to act knowingly and with the purpose to deceive or cheat.").[18]

As I explained above in regard to Counts 4 and 6, I think the Government presented sufficient evidence at trial from which a rational jury could have found that Defendants acted with the intent to deceive by knowingly misrepresenting the Bank's amount of "past due" loans in documents filed with the SEC. That includes the amount of "past due" loans disclosed in the Bank's Form 10-K for 2009, which the Bank incorporated into its Offering Prospectus in

---

[18] I am unaware of any case in the Third Circuit addressing "fraudulent intent" under § 1348.

connection with the capital raise. (*See* GX 3; Tr. at 5841:21–5842:1). The Government showed at trial that the Bank reported $10.9 million in loans past due 90 days or more, but omitted to report $303,639,546.99 in 90-day past due loans. (Tr. at 4220:22–4221:3). Further, the Government presented evidence showing that Defendants each participated in drafting or reviewing the Bank's Form 10-K for 2009. (*See* GX 433A; GX 433R; GX 516; GX 558; Tr. at 3490:23–3497:3, 3504:18–3506:1). It further presented evidence showing that in approximately January 2009, Defendant Gibson had begun discussing the possibility of raising capital through a public stock offering with a JP Morgan representative (*see* Tr. at 5799:2–5802:12), and that Defendants Rakowski and North became aware of the capital raise in early February 2010 (*see* GX 436; GX 633/633A).

Defendant North separately challenges his conviction as to Count 2 on the basis that "[t]here was no evidence that Mr. North played any role in the planning of the capital raise, the preparation of the Prospectus, or that he signed any documents related to the undertaking." (D.I. 825 at 42). Acknowledging that he participated at least in part in the capital raise and in preparing the accompanying Form 10-K, he argues that "no reasonable juror could conclude that [his] *de minimis* edits to the 2009 Form 10-K, his remarks during the February 11, 2010 meeting with JP Morgan, or his remarks during the January 2010 earnings call could possibly establish fraudulent intent or materially impact the investing public." (*Id.* at 43–44).

As an initial matter, North's suggestion that the Government was required to prove that his edits or remarks "materially impact[ed] the investing public" is misplaced. Those edits and remarks were not charged as false statements in the indictment. And in connection with securities fraud (Count 2), I instructed the jury to consider only the Bank's statements in its Form 10-K for 2009. (Tr. at 6839:3–14, 6844:14–6845:9). As noted above, those statements included

the Bank's reported amount of loans past due 90 days or more. Defendants stipulated to the materiality of that amount. (*Id.* at 5698:2–5703:13).

As to North's criminal intent, viewing the evidence in the light most favorable to the Government, I think there is sufficient evidence from which a rational jury could have found that North acted with the intent to deceive in connection with the amount of "past due" loans disclosed in the Bank's Form 10-K. At trial, the Government presented evidence from which a reasonable jury could infer that North became aware of the capital raise no later than February 5, 2010 (*see* GX 633/633A), prior to the Bank's meeting with JP Morgan on February 11. Further, the Government presented evidence showing that on February 7, 2010, North received a copy of the MD&A section of the Bank's Form 10-K for 2009. (GX 516). He subsequently provided edits to that section, including the section in which the Bank discussed its "past due" loans. (*See* GX 433A; GX 433R). Further, as described above, the Government presented evidence regarding North's awareness of and involvement in the Waiver Practice and his understanding of its impact on the Bank's public reports.

b. Falsity

As noted above, in connection with the Government's theory under subsection (2) of the federal securities fraud statute, I instructed the jury to consider only three specific statements, two of which were quantitative disclosures of the Bank's amount of loans past due 90 days or more. As to the Government's theory under subsection (1), I instructed the jury generally in regard to the Bank's Form 10-K for 2009, which would necessarily include those same "past due" loan amounts. I have already concluded above that, in light of the SEC's unambiguous "past due" loan reporting requirements, a rational jury could have found that the Bank misrepresented its amount of loans past due 90 days or more in its documents filed with the SEC.

34

Defendants do not otherwise appear to challenge the falsity of the other statements included in the Bank's Form 10-K for 2009.

### c. Materiality

Defendant Gibson additionally argues that the jury's verdict as to Count 2 cannot stand because "it is based on scheme liability that was never proven up at trial." (D.I. 828 at 35). More specifically, he argues that the Government failed to prove the materiality of the statements that formed the basis of its scheme to defraud theory under subsection (1). (*See id.* at 35–37). He refers specifically to qualitative statements regarding the Bank's discussion of its "problem loans" and how the Bank "mitigate[s] credit risk." (*Id.*). He also points to certain quantitative statements, which, Gibson argues, the Government failed to prove were "'affected' by the Bank's false disclosure of past due loans." (*Id.* at 36).

I am not persuaded. Rather, I agree with the Government that even if it failed to prove the materiality of the statements identified by Gibson or the impact of the Bank's "past due" loan disclosures on other quantitative statements, the Government's failure in that regard would be inconsequential. (*See* D.I. 829 at 47). That is because, assuming the Government failed to prove the materiality of the statements identified by Gibson in connection with its theory under subsection (1), the evidence was sufficient to support a conviction pursuant to subsection (2), and thus I assume it was on that alternative theory that the jury convicted Defendants of securities fraud. *See United States v. Syme*, 276 F.3d 131, 144 (3d Cir. 2002) (noting the "longstanding rule that if the evidence is insufficient to support a conviction on one alternative theory in a count but sufficient to convict on another alternative theory that was charged to the jury in the same count, then a reviewing court should assume that the jury convicted on the factually sufficient theory and should let the jury verdict stand" (citing *Griffin v. United States*, 502 U.S.

46, 49–50 (1991)). Indeed, other than arguing that the Government failed to prove the requisite criminal intent and falsity of the Bank's "past due" loan submissions, elements on which I have already concluded the Government presented sufficient evidence at trial, Gibson does not appear to challenge the sufficiency of the evidence as to the Government's theory under (2).

In light of all the evidence discussed earlier, I think a reasonable juror could have found that Defendants, acting with the requisite *mens rea*, executed a scheme to obtain money by means of false representations in regard to the Bank's amount of loans that were past due 90 days or more, via the February 2010 capital raise. *See* 18 U.S.C. § 1348(2).

### 3. Conspiracy

Defendants challenge the jury's verdict as to Count 1 of the indictment, which charged Defendants with conspiracy to defraud the United States, to commit securities fraud, and to make or cause to be made false statements in reports filed with the SEC and the Federal Reserve, in violation of 18 U.S.C. § 371.

To prove conspiracy under § 371, the Government must establish: (1) an agreement or understanding between two or more persons to accomplish an unlawful objective, (2) that at some time during the existence of the agreement or understanding, "one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement," and (3) that at some point during the existence of the agreement or understanding, "the defendant knew the purpose of the agreement, and then deliberately joined" the agreement or understanding. *United States v. Conley*, 37 F.3d 970, 976–77 (3d Cir. 1994) (citation omitted). That means it must show that the alleged conspirators "shared a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward that goal." *United States v. Wexler*, 838 F.2d 88, 90–91 (3d Cir. 1988),

*abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013) (en banc).[19]

These elements "can be proven entirely by circumstantial evidence." *Brodie*, 403 F.3d at 134. "Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *Id.* (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)). Thus, "[t]he existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Smith*, 294 F.3d at 477. "To sustain a conspiracy conviction, the contention that the evidence also permits a less sinister conclusion is immaterial[.] . . . [T]he evidence need not be inconsistent with every conclusion save that of guilt." *Id.* at 478. "Knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy." *United States v. Park*, 505 F. App'x 186, 189 (3d Cir. 2012). The Court must consider the evidence of conspiracy as a whole. *United States v. U.S. Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) ("[T]he character and effect of a conspiracy (is) not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913))).

As the Third Circuit has cautioned, however, the Court must "give close scrutiny to the sufficiency of the government's evidence in a conspiracy case . . . for the reasons that [s]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict .

---

[19] The Government must also prove "at least the degree of criminal intent necessary for the underlying substantive offense[s]" of defrauding the United States, securities fraud, and making or causing to be made false statements in documents filed with the SEC and the Federal Reserve. *See Brodie*, 403 F.3d at 147. For the reasons stated earlier, I think there is sufficient evidence from which a reasonable juror could have found that each Defendant acted with the criminal intent necessary for each of those underlying offenses.

. . and guilt must remain personal and individual." *Brodie*, 403 F.3d at 134 (alteration in original) (citations omitted). "Conspiracy cannot be proven by piling inference upon inference where those inferences do not logically support the ultimate finding of guilt." *Id.* "[A] conviction based on speculation and surmise alone cannot stand." *United States v. Nagle*, 2013 WL 3894841, at \*44 (E.D. Pa. July 26, 2013).

As to conspiracy, Defendants argue that the Government failed to prove: (1) the existence of an agreement, (2) that Defendants intended to join that agreement, or (3) that they did so with knowledge of the agreement's unlawful objectives. *(See* D.I. 825 at 40; D.I. 826 at 14; D.I. 828 at 25).[20]

More specifically, Defendants argue that all the Government showed at trial was "an agreement among Defendants to carry out the waiver practice in good faith." (D.I. 828 at 25; *see also* D.I. 826 at 15). In other words, they argue, the Government merely proved that Defendants engaged in a routine, decades-old business practice, without presenting any evidence of their intent to commit a crime while doing so. *(See* D.I. 826 at 15–16, 20, 22; *see also* D.I. 825 at 40; D.I. 828 at 27). According to Defendants, that the Government failed to prove the existence of an agreement is further supported by the evidence at trial demonstrating that the Bank disclosed the existence of the Waiver Practice to the Federal Reserve and the Bank's outside auditors. (D.I. 826 at 18–19).

In my opinion, a rational jury viewing the evidence as a whole need not have accepted the inference urged by Defendants, that no conspiracy existed because Defendants were merely

---

[20] Defendant Gibson additionally argues that the Government failed to present evidence establishing an agreement between Gibson and Joseph Terranova or Brian Bailey. *(See* D.I. 828 at 27–28). Gibson raises a similar argument in his motion for a new trial. I address his argument on that point in my analysis of Defendants' Rule 33 motions.

carrying out a business practice in the same way that it had been done at the Bank for decades. Indeed, the Government presented evidence at trial to rebut Defendants' "good faith" argument in that regard. In particular, it showed that while the Bank waived loans as far back as 1999, the amount of loans waived at that time was substantially smaller than the amount during the conspiracy period. In 1999, for example, the Bank waived one matured loan totaling $1,087,742, as current-for-interest and in the process of extension. (*See* Tr. at 1898:3–1902:21). Similarly, in 2006, it waived only nine loans totaling $2,716,067. (*Id.* at 4053:24–55:3). By 2009, however, evidence at trial showed that the Bank faced a growing amount of matured loans, a significant portion of which were commercial real estate loans where the borrowers were unable to repay the principal due at maturity. (*See id.* at 3891:16–3892:8). I think a jury could have reasonably inferred that, faced with the state of the Bank's loan portfolio, Defendants, during the relevant time period, implicitly agreed to mispresent the Bank's total amount of "past due" loans in order to make the Bank's financial condition appear better than it was.

I think a reasonable jury would have also been justified in rejecting the inferences urged by Defendants regarding the Bank's purported disclosure of the Waiver Practice. As an initial matter, there was no evidence suggesting that the Bank disclosed the practice to the SEC. As to the Federal Reserve and the Bank's auditor, the Bank provided documents from which examiners and auditors could have gleaned the Waiver Practice and its impact on the Bank's public reports. In my view, however, a reasonable jury need not have accepted Defendants' view that there could be no conspiracy in light of those disclosures.

A rational jury, having concluded that Defendants were aware that the Waiver Practice caused the Bank to submit false "past due" loan amounts, could further draw the inference from Defendants' conduct and communications regarding the Waiver Practice, that Defendants had an

implicit "agreement to work together toward [the] goal[s]," *Wexler*, 838 F.2d at 90–91, alleged in the indictment.

To summarize each Defendant's involvement in the Bank's public reporting process: North was responsible for the Delinquency Report and approving the "waiver" of loans from that Report; Rakowski was responsible for the Bank's Past Due Report and more generally, the Bank's public reporting; Gibson was also responsible for the Bank's public reporting; and Gibson and Harra signed the Bank's SEC reports and its Call Reports. Further, as described above, the Government introduced various communications between Defendants showing their coordinated efforts and common understanding in regard to the Bank's "past due" loan submissions (*see, e.g.*, GX 418; GX 472; GX 473; GX 476/476A; GX 574), which at times omitted hundreds of millions of dollars in loans that were 90 days or more past due for principal repayment under their contractual terms.

Viewed in the light most favorable to the Government, I think this evidence, together with the evidence described earlier, supports the reasonable inference that Defendants worked together with the common purpose to misrepresent the Bank's amount of "past due" loans to federal regulators and the public. A rational juror could have found that this implicit agreement included the objective to deceive the Federal Reserve by misrepresenting the Bank's amount of "past due" loans in its Call Reports and regulatory reports, and the objective to commit securities fraud by mispresenting the Bank's financial condition in connection with the February 2010 capital raise.

Thus, I conclude there was sufficient evidence for the jury to conclude that Defendants intentionally entered an agreement knowing of its objectives to defraud the United States, commit securities fraud, and make false statements to federal regulators.

### 4. False Certifications (Gibson)

Gibson challenges the jury's verdict as to Counts 17 to 19 of the indictment, which charged Gibson with making false certifications in the Bank's SEC Form 10-Q for the Third Quarter of 2009, Form 10-K for 2009, and Form 10-Q for the First Quarter of 2010, in violation of 18 U.S.C. § 1350.

Section 1350(a) requires that "[e]ach periodic report containing financial statements filed by an issuer with the [SEC] pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 . . . be accompanied by a written statement by the [CEO] and [CFO] . . . of the issuer." 18 U.S.C. § 1350(a). Subsection (b) in turn provides, "The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) . . . and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer." *Id.* § 1350(b). Finally, subsection (c) imposes criminal liability on anyone who certifies or willfully certifies "any statement as set forth in subsections (a) and (b) . . . knowing that the periodic report accompanying the statement does not comport with all the requirements set forth." *Id.* § 1350(c)(1)–(2).

Gibson challenges his § 1350 convictions on three principal bases.

First, he argues that the Government failed to present evidence on the requirements of Sections 13(a) and 15(d). (D.I. 828 at 29–30). In arguing that the requirements of those sections "are essential" to these counts, he points to a portion of my final jury instructions, which state, "The government contends that the certifications . . . were false because loans that were matured, current for interest payment, and in the process of extensions, were . . . required to be reported as

'past due' pursuant to either Section 13(a) or 15(d) of the Securities Exchange Act." (*Id.* at 30 (emphasis and citation omitted)).

As the Government points out, to the extent that instruction suggests that the Government was required to tie "past due" loan reporting to Section 13(a) or 15(d), it is not a correct statement of law. As explained above, and as I instructed the jury, § 1350 creates a two-part certification requirement. First, that the financial statement complies with Section 13(a) or 15(d), which require only that issuers of securities file certain annual and quarterly reports with the SEC. Second, that the information contained in the report fairly presents the financial condition and results of operation of the issuer. Section 1350(c)(1), in turn, imposes criminal liability upon anyone who certifies that statement knowing that the accompanying report does not comport with all those requirements. Thus, contrary to Gibson's contentions, I do not think the Government was required to present anything more with respect to the requirements of Sections 13(a) or 15(d). It was sufficient for the Government to prove, for purposes of § 1350, that the accompanying periodic reports did not fairly present the Bank's financial condition, because they omitted a material amount of loans past due 90 days or more. And as the Government notes, even assuming that instruction created an additional element beyond what the Government was required to prove under § 1350, my review of the sufficiency of the evidence "does not rest on how the jury was instructed." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016). In any event, I think my instructions on the law for Counts 17 to 19 were sufficient. I therefore find Defendant's first argument unpersuasive.

Second, Gibson argues that the Government failed to present evidence showing that he knew the requirements of Sections 13(a) and 15(d). (D.I. 828 at 29). Third, he argues that the

42

Government failed to present evidence showing that he knew the certifications were false at the time they were made. (*Id.*).

As to Gibson's second argument, I think the Government presented sufficient evidence from which a rational jury could have found that Gibson knew of the requirements of Section 13(a) or 15(d). At trial, the Government presented evidence showing that Gibson signed the Bank's Form 10-K. The signature page stated that the report was signed "[p]ursuant to the requirements of Sections 13 or 15(d) of the Securities Exchange Act of 1934." (GX 1). Further, the written certification accompanying the Bank's 10-K referenced Section 13(a) of the Act. (*See* GX 1A). The Government also presented evidence showing that each of the three reports identified in Counts 17 to 19 included a box at the top of the document, which was checked so as to indicate that the report was being filed pursuant to Section 13 or 15(d). (*E.g.*, GX 1, p. 1).

As to Gibson's third argument, I think the Government presented sufficient evidence for a rational jury to find that Gibson knew that the information contained in the Bank's three reports accompanying the certifications did not fairly present, in all material respects, the financial condition and results of operations of the Bank. As explained earlier, I think the Government presented sufficient evidence from which a reasonable jury could have found that Gibson knowingly and willfully made false statements regarding the Bank's "past due" loan amounts in the Bank's SEC reports. Having drawn that inference, a reasonable jury could have inferred that Gibson therefore knew the reports did not present the Bank's financial condition and results of its operations.

Gibson again makes a "good faith" argument that he "reasonably relied on the sub-certifications of numerous individuals throughout the Bank. . . . [t]hrough [which] . . . Gibson was able to gain comfort that the individuals preparing the reports believed them to be accurate

and were not aware of any fraud." (D.I. 828 at 33). He points also to the fact that the certifications required only that he certify the information in the reports "to the best of his knowledge." (*Id.* at 34).

Those are arguments that Gibson was free to make, and did make, to the jury at trial. In my opinion, however, the jury would have been justified in rejecting those "good faith" arguments and instead drawing the reasonable inferences described above in regard to Gibson's awareness of the relevant regulations, and knowledge that the reports at issue did not fairly present the Bank's financial condition and results of operation because they omitted material amounts of the Bank's 90-day or more "past due" loans.

## 5. Due Process

Defendants argue that their convictions violate Due Process. (*See* D.I. 824 at 17–19; D.I. 825 at 22–25;[21] D.I. 826 at 24 n.10; D.I. 828 at 19). More specifically, they point to the "fair warning requirement" under which no person "shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997). As the Court explained in *Lanier*, the "touchstone" of that requirement "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Defendants argue they could not have known their conduct was unlawful because during the relevant time period, there was no single, unambiguous definition of a "past due" loan. As explained above (and in D.I. 740 as to the Call Report instructions), however, I think the

---

[21] Defendant North additionally argues that the indictment is "fatally deficient in that it fails to satisfy the Notice Clause and Grand Jury Clause contained in the Sixth and Fifth Amendments, respectively." (D.I. 825 at 26). I understand his arguments in that regard to be essentially the same as arguments he and the other Defendants made in moving to dismiss the Third Superseding Indictment. (*See, e.g.*, D.I. 292). I previously rejected those arguments (*see* D.I. 351), and thus will not revisit them again.

reporting instructions made clear that the Bank was required to report as "past due" its amount of loans for which principal or interest had gone unpaid for 90 days or more beyond the date it was due under the loans' contractual terms. In other words, they "made it reasonably clear at the relevant time," *see id.*, that the Bank was required to report as "past due" the loans that it omitted from its public filings pursuant to the Waiver Practice. Thus, I am hard pressed to see how upholding Defendants' convictions would violate the constitutional principle of fair warning on the basis that no unambiguous definition of "past due" existed at the relevant time.

They argue also that the Government's theory of falsity is unconstitutional because it is based on deteriorating market conditions, and thus "is inherently at odds with the 'fair notice' requirement." (D.I. 828 at 24; *see also* D.I. 824 at 15).[22] They point specifically to the Government's omnibus response to Defendants' motions for judgment of acquittal filed at the close of the Government's case, in which the Government asserted essentially that in light of Defendants' awareness of the Bank's growing number of matured loans, the economic downturn, and the results of the Federal Reserve's examination of the Bank, "the decision to continue to employ the waiver practice . . . transformed what was at-a-minimum a bad business practice into a criminal act." (D.I. 750 at 23). The Government responds that this "quoted portion of [its] Omnibus Response had nothing to do with the standard for falsity." (D.I. 829 at 17–18 n.6). Rather, "It was contained within a section . . . entitled 'WILLFULNESS.'" (*Id.*).

To the extent the Government's statement in its brief, that the Waiver Practice "transformed . . . into a criminal act," can be read to suggest a sort of "tipping point" theory by which the Bank's "past due" loan submissions became false only when the economy and the

---

[22] Gibson makes a similar argument in his Rule 33 motion. (*See* D.I. 827 at 17–19). Because I reject that argument here, I do not address it again in my discussion of Defendants' motions for a new trial.

45

Bank's financial condition worsened (*see* D.I. 824 at 15), I do not think that suggestion is consistent with how the Government presented its theory of falsity at trial. As the Government points out, it asserted during closing arguments that the Waiver Practice began as a "little white lie," which is a lie nonetheless, and, over time, it transformed into "a matured loans beast."[23] (*See* Tr. at 6901:14–16). Accordingly, I understood the Government to be arguing that the magnitude of the lie grew over time, reaching its peak in the time period of the charged conduct. Indeed, the Government maintained during closings that the Waiver Practice "was always wrongful . . . because it didn't comport with the applicable regulations in terms of reporting past due loans." (*Id.* at 6894:5–8). Thus, contrary to Defendants' contentions, I do not think the Government relied upon an unconstitutional theory of falsity at trial.

## III. MOTIONS FOR A NEW TRIAL

### A. Legal Standard

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Whether to grant a Rule 33 motion lies within the district court's sound discretion." *United States v. Ortiz*, 182 F. Supp. 2d 443, 446 (E.D. Pa. 2000) (citation omitted). "In exercising its discretion, the court may grant a motion for a new trial on one of two grounds." *Id.* First, the Court may grant a Rule 33 motion if it believes not only that the jury verdict is contrary to the weight of the evidence, but also that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Silveus*, 542 F.3d 993, 1004–05 (3d Cir. 2008). "Unlike an insufficiency of the evidence claim, in which the court views the evidence in the light most favorable to the government, a challenge to the weight

---

[23] Whether, in this context, a "little white lie" would be a *material* false statement is not something I need to decide. But it seems obvious that the bigger the lie, the more likely it is to be deemed material.

of the evidence permits the court to exercise its own judgment in assessing the government's case." *Nagle*, 2013 WL 3894841, at \*47 (citing *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Motions for a new trial based on the weight of the evidence are not favored. . . . [They] are to be granted sparingly and only in exceptional cases." *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citation omitted). "Second, the court must grant a new trial if trial error had a substantial influence on the verdict." *Ortiz*, 182 F. Supp. 2d at 446 (citation omitted).

## B. Discussion

Defendants seek a new trial on two principal bases. The first is that the jury's verdict was against the weight of the evidence. The second is that the Government's conduct in this case caused a prejudicial variance and constructive amendment.

### 1. Weight of the Evidence

Defendants seek a new trial on the basis that the jury's verdict was against the weight of the evidence. (*See* D.I. 824 at 28; D.I. 825 at 21; D.I. 826 at 24; D.I. 827 at 8).

"[E]xercis[ing] [my] own judgment in assessing the Government's case," and thus not viewing the evidence in the light most favorable to the Government, *Johnson*, 302 F.3d at 150, I do not believe the jury's verdict was against the weight of the evidence. As I explained above with respect to Defendants' motions for judgment of acquittal, I think the Government presented substantial evidence at trial from which a reasonable jury could have found Defendants guilty of the counts charged in the indictment.

Indeed, looking at it as a whole, the way I see this case is pretty simple. The Bank's loan portfolio was heading south fast. The Bank needed capital. Rather than disclosing the extent of its 90-day past due loans, it lied about that amount repeatedly. Defendants knew this, but

participated in filing the false Call Reports and SEC reports anyhow. Defendants knew they were being dishonest.

Accordingly, I will not grant Defendants a new trial on the basis that the jury's verdict was against the weight of the evidence.

## 2. Variance/Constructive Amendment

Defendants argue that the Government's prosecution of this case resulted in a constructive amendment and prejudicial variance, warranting a new trial on all counts. (*See* D.I. 824 at 13 n.3; D.I. 825 at 34–38; D.I. 826 at 24 n.10; D.I. 827).

The general prohibition against constructive amendments stems from the Fifth Amendment guarantee that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" U.S. Const. amend. V; *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) (citation omitted). Pursuant to that constitutional guarantee, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). "An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006); *see also Vosburgh*, 602 F.3d at 532 ("An indictment can be constructively amended through evidence, arguments, or the district court's jury instructions, if they effectively amend the indictment by broadening the possible bases for conviction from that which appeared in the indictment."). The "key inquiry is whether

48

the defendant was convicted of the same conduct for which he was indicted." *Daraio*, 445 F.3d at 260.

"Variances and constructive amendments are similar in that both involve variations between the charges in an indictment and the evidence at trial." *Vosburgh*, 602 F.3d at 532. A variance occurs "where the charging terms of the indictment are not changed but when the evidence at trial proves facts materially different from those alleged in the indictment." *Daraio*, 445 F.3d at 259. "Not all variances constitute reversible error," however. *Vosburgh*, 602 F.3d at 532. "A variance result[s] in a reversible error only if it is likely to have surprised or has otherwise prejudiced the defense." *Id.* (alteration in original). "To demonstrate prejudice from a variance, the defendant must show that the variance prejudiced some substantial right." *Id.* "A variance that sufficiently informs the defendant of the charges against him and allows him to prepare his defense without being misled or surprised at trial does not prejudice the defendant's substantial rights." *Id.*

Defendants' variance and constructive amendment arguments appear to fall into the following three categories. First, that the Government broadened its theory of falsity at trial from what it alleged in the indictment. (*See* D.I. 825 at 34–38; D.I. 827 at 14–17). Second, that the Government charged one conspiracy in the indictment, but, at trial, "it was permitted to introduce and taint the jury with significant information about a separate and distinct conspiracy" between Joseph Terranova and Brian Bailey. (D.I. 827 at 22). Third, that various "inconsistencies" in the Government's prosecution of this case further caused a constructive amendment and prejudicial variance. (*See* D.I. 825 at 34).

### a. Theory of Falsity

As to falsity, Defendant Gibson argues, "[T]he government was permitted prejudicial flexibility in submitting and arguing shifting standards for falsity for both the Bank's SEC filings and Call Reports." (D.I. 827 at 10). More specifically, he contends that "the government's own expert witness testified to the lack of a definition of 'past due loan' in SEC or . . . [GAAP] guidance . . . and . . . presented no other objective standard by which falsity for purposes of SEC reporting could be measured." (*Id.* at 11). Gibson cites nothing to support his suggestion that the Government was required to identify a GAAP provision defining the term "past due." As explained above, I think the SEC reporting instructions unambiguously set forth an "objective standard" with respect to the loans that were required to be reported as "past due" in the Bank's SEC filings. That standard is consistent with the definition of "past due" identified in the indictment.

As to Call Reports, Gibson argues that "the government relied on a tortured and illogical interpretation of the Schedule RC-N instructions, arguing that both Circumstance #3 and Circumstance #4 of the Schedule applied to the vast majority of loans at issue in this case." (*Id.* at 11–12 (emphasis and citations omitted)). I do not see how the Government's interpretation is illogical. To the contrary, as I explained in my Memorandum Order of March 6, 2018, I think the Government's interpretation is logical while Defendants' is not. (*See* D.I. 696 at 2 n.1). Defendants urge an unreasonable interpretation under which a matured loan that is past due for principal need never be reported as "past due." That interpretation leaves a wide gap in the reporting obligations, and ignores the Call Report instructions' clear statement that loans are "past due" for reporting purposes when either principal or interest goes unpaid under the loans'

contractual terms. In any event, I think Circumstance 4 is consistent with the definition of "past due" set forth in the indictment, and the Government's theory at trial.[24]

North similarly argues that the Government shifted its theory of falsity at trial. He sets forth what he identifies as seven "iteration[s]" of the Government's "standard of criminality." (D.I. 825 at 29–33). It seems clear to me, however, that the Government has all along maintained the position that a loan is "past due" for reporting purposes if principal or interest goes unpaid beyond the date it is due in the loan contract. That "standard of criminality" was plainly set forth in the Third Superseding Indictment, and is consistent with the Bank's reporting obligations as to the SEC and the Federal Reserve, which tie the "past due" status of a loan to its contractual terms.

North argues also that the Government's presentation of evidence and argument in regard to the falsity of "notations" in the Bank's Delinquency Reports, that certain loans were "current for interest" and in the "process of extension," caused a prejudicial variance. (*See id.* at 36–37). As the Government points out, however, any evidence or argument as to those preconditions to the Waiver Practice did not relate to the falsity of the "past due" loan amounts at issue in the indictment. Rather, it related to the Government's position at trial that North did not waive loans

---

[24] Gibson additionally argues that I "unreasonably delayed" in ruling on the Circumstance 3 or 4 issue such that I undermined "Defendants' defense strategy and eliminated Defendants' opportunity to develop [their] position and elicit the necessary underlying facts at trial." (D.I. 827 at 14). The crux of his argument seems to be that Defendants "adjusted their entire trial strategy" based upon a statement I made in my Memorandum Order of March 6, 2018. (*See id.*). That argument is not persuasive. In that Memorandum Order, I stated that I thought it was "premature for me to decide, assuming that I am the one who should decide, whether the loans in this case fall within Circumstance #4." (D.I. 696 at 2). I do not see how I prejudiced Defendants because they chose to rely upon that statement. At trial, Defendants elicited testimony regarding a Wilmington Trust promissory note, as I understood it, to support their position that the Bank's loans did not provide for the payment of interest at maturity. (*See* Tr. at 1666:2–1669:17). That they chose not to present additional evidence or testimony does not, in my opinion, demonstrate that Defendants were prejudiced by something I said or ruled on during the trial. I also note that no Defendant, including Gibson, asked for any delay in order to prepare or offer such evidence, or made any proffer of such evidence.

in good faith because he knew they were not in fact in the "process of extension." Thus, I find North's argument in that regard unpersuasive.

Further, North maintains that "the Government broadened the bases for conviction resulting in a constructive amendment and a highly prejudicial variance" by arguing that "Mr. North's statements set a new standard for falsity." (*Id.* at 37). He points specifically to statements made by the Government during its summation. (*See id.*). I have reviewed the relevant portions of the trial transcript and do not agree with North's characterization of the Government's statements. While the Government referred to North's "disregard[ing] his own standard" (Tr. at 6898:17–22), it did so in the context of discussing the Bank's internal standards with respect to waiving loans, not to the "standard for falsity" set by the relevant reporting requirements.

Gibson additionally argues, "The government broadened the basis for determining the falsity of past due loan amounts beyond the waiver practice by claiming at trial—for the first time—that matured loans subject to short-term extensions were also falsely not reported as past due." (D.I. 827 at 14). Similarly, North contends that the Government impermissibly broadened the bases for possible conviction by presenting evidence relating to the Bank's "mass extension" of loans and arguing that the "mass extension," while "not charged as a false statement in the indictment," was "also wrongful." (D.I. 825 at 36).

I am not persuaded. As an initial matter, I do not understand the basis for North's suggestion that the Government could not have presented evidence in regard to the Bank's "mass extension" process unless those extensions were charged as false statements in the indictment. Prior to its discussion of the capital raise, the indictment outlined in detail the Bank's October 2009 "mass extension" process. (*See* D.I. 243 ¶¶ 40–45). Further, Count 2 of the indictment

charged Defendants with securities fraud under both a scheme to defraud theory and a false or fraudulent misrepresentations theory. Thus, in my view, the Government was justified in presenting evidence related to the Bank's "mass extension" process at trial, particularly as it was relevant to its scheme to defraud theory in connection with the February 2010 capital raise. Further, in its summation, the Government discussed the Bank's "mass extension" process in connection with that capital raise. (*See* Tr. at 6945:13–6946:14).

And as to the specific false statements alleged in the indictment, the Government focused at trial on loans waived from the Bank's "past due" reports, not on loans subject to the 2009 "mass extension." In particular, the Government's summary witness, Larry Hart, testified in detail about the loans waived from the Bank's "past due" reports from 2009 through the First Quarter of 2010. (*See id.* at 4216:23–4226:13). Thus, I do not understand the Government to take the position that the Bank's "mass extension" of loans constituted an independent basis for falsity as to the specific false "past due" loan amounts alleged in the indictment. And to the extent any of the Government's arguments during its closing can be interpreted in that way, I do not think those statements either created "a substantial likelihood" that the jury convicted Defendants on that basis, *see Daraio*, 445 F.3d at 259–60, or caused a variance in proof that prejudiced Defendants' substantial rights, *see Vosburgh*, 602 F.3d at 532.

### b. Conspiracy Between Terranova and Bailey

According to Defendant Gibson, the evidence adduced at trial regarding alleged co-conspirators Terranova and Bailey, "constituted a highly prejudicial variance from the [Third Superseding Indictment]." (D.I. 827 at 19). More specifically, Gibson argues that while Defendants were alleged to have conspired with Terranova and Bailey, the evidence at trial

53

instead showed that Terranova and Bailey entered into a "separate and distinct conspiracy that did not involve any of the Defendants." (*Id.* at 20).

At trial, the jury heard testimony from Terranova, a loan relationship manager and later division manager at the Bank, who pleaded guilty to conspiracy to commit bank fraud. Terranova testified at length about the three types of misconduct underlying his guilty plea. (*See* Tr. at 4322:21–4345:3). They were: (1) altering a loan document, (2) abusing the ten percent rule, and (3) improperly extending credit at the end of 2009. (*See id.* at 4322:21–4323:24). Terranova implicated Bailey in the misconduct. (*See id.* at 4330:3–10). But that misconduct was for the most part unrelated to the charges brought against Defendants.

As Gibson notes, "Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989) (citation omitted). Where such a variance occurs, however, a conviction will only be overturned if the defendant can show that the variance prejudiced his or her substantial rights. *United States v. Kemp*, 500 F.3d 257, 291 (3d Cir. 2007).

Here, even assuming the evidence presented at trial proved two distinct conspiracies— one between Defendants and a second between Terranova and Bailey—I am not persuaded that variance prejudiced Defendants substantial rights.

As an initial matter, the Government did not, as I understood it, offer Terranova's testimony as substantive proof of the conspiracy with which Defendants were charged. Further, the Government consistently argued that "the conspiracy [between Defendants] . . . was an agreement to keep the reported past due number down" (*e.g.*, Tr. at 7002:14–16)—not to engage in the lending abuses underlying Terranova's guilty plea. To the extent the Government suggested during its summation that Terranova's and Bailey's misconduct was relevant to

establish Defendants' participation in the conspiracy to lie about the Bank's "past due" loans, I do not think any such suggestion ultimately prejudiced Defendants' substantial rights. Moreover, as the Third Circuit explained in *Kemp*, "the danger of prejudice increases along with the number of conspiracies and individuals that make up the wrongly charged single conspiracy." 500 F.3d at 292. Here, as in *Kemp*, I think there is less danger of prejudice given that this case involved at most six conspirators and two conspiracies. *See id.* ("This case is more similar to *Berger*," which involved two conspiracies involving four individuals, "as there were five alleged conspirators that make up three distinct conspiracies. Thus, there is little danger that prejudice inevitably occurred based on the sheer number of defendants and conspiracies."). Thus, I am not persuaded by Gibson's argument in regard to the separate conspiracy between Terranova and Bailey.

### c. Other Inconsistencies

Defendant North additionally argues that the Government "broadened the charges against [him] by arguing that the waiver practice was a 'little white lie' that became a 'matured loans beast.'" (D.I. 825 at 35). According to North, the Government's position in that regard "directly conflicts with how the Government – and the Grand Jury – charged this case." (*Id.*). He states, "The Grand Jury specifically charged in Counts 1 through 16 that certain SEC Reports, Call Reports, and a Regulatory Report were false from October 2009 to November 2010. By arguing that 'the waiver practice was always wrongful,' the jury could convict on conduct that pre-dated the indicted period." (*Id.*). Thus, he maintains, the Government's conduct caused a constructive amendment. (*Id.* at 36).

I am not persuaded. The Government's references in its closing argument to the Waiver Practice as "always wrongful" and a "little white lie" did not, in my opinion, create a substantial

likelihood that the jury convicted North for an offense other than the specific false statements charged in the indictment. *See Daraio*, 445 F.3d at 259–60. At the end of the case, I instructed the jury on those specific statements, explaining that it could consider only those statements identified as to each count. Further, I think the Government was justified in contrasting the Waiver Practice during the time period of the charged conduct to that practice in the years prior, to rebut Defendants' argument that their conduct was innocent as the Bank had been waiving loans in the same way for decades.

Finally, North argues, "[T]he Government expanded its case against Mr. North when it presented a case to the Grand Jury that relied on the TFR instructions and then later took the position when it suited it that the TFR instructions were not relevant." (D.I. 825 at 37). As the Government points out, however, nowhere in the indictment is there any reference to the TFR instructions. In other words, none of the charges in the indictment are based on the Bank's reporting obligations pursuant to those instructions.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions for judgment of acquittal and a new trial are **DENIED**.

An appropriate order will be entered.